**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW MEXICO**

| | |
|---|---|
| HUMAN RIGHTS DEFENSE CENTER,<br>a not-for-profit corporation,<br><br>                   Plaintiff,<br><br>v.<br><br>(1) SANTA FE COUNTY, NM;<br><br>(2) DEREK WILLIAMS, Warden,<br>individually and in his official capacity;<br><br>(3) MICHAEL OLIVER, Deputy Warden,<br>individually and in his official capacity;<br><br>(4) CARLOS MARKMAN-LOPEZ, Major,<br>individually and in his official capacity; and<br><br>(5) JOHN AND JANE DOES 1-10, Staff,<br>individually and in their official capacities;<br><br>                   Defendants. | Case No.:<br><br>**PLAINTIFF'S MOTION FOR<br>PRELIMINARY INJUNCTION<br>AND MEMORANDUM OF LAW<br>IN SUPPORT** |

## I.  INTRODUCTION

Plaintiff Human Rights Defense Center (HRDC), pursuant to Fed. R. Civ. Pro. 65, hereby moves for a preliminary injunction enjoining the Defendants from unconstitutionally censoring books sent to prisoners at the Santa Fe County Adult Correctional Facility (the "Jail").

HRDC seeks to provide incarcerated persons with reading materials regarding their legal and civil rights and options for accessing education while incarcerated.  Since October 2017, Defendants have refused to deliver hundreds of HRDC's mailings to persons incarcerated at the Jail, violating HRDC's First Amendment right to communicate information to these individuals. In addition, Defendants have failed to provide HRDC adequate notice and an opportunity to challenge any censorship decisions, in violation of the Due Process Clause of the Fourteenth

Amendment.  Defendants' serious violations of the Constitution are causing HRDC irreparable harm.  As a settled matter of First Amendment law, the continued deprivation of HRDC's free-speech rights is precisely the type of irreparable harm that justifies preliminary injunctive relief.

HRDC's books pose no threat to the safety and security of the Jail, and, in fact, are successfully distributed in jails and prisons all over the United States.  HRDC has no alternative means of communicating with persons incarcerated at the Jail, and these persons likewise have no alternative means of accessing the information contained in HRDC's books – information that is crucially important to assisting these individuals in participating in their legal defense and preparing to re-enter society as productive citizens.

To remedy these constitutional violations, HRDC requests that this Court enter a preliminary injunction (1) prohibiting Defendants from continuing to arbitrarily and illegally censor written materials sent to prisoners in the Jail; and (2) requiring that Defendants satisfy due process by providing HRDC with adequate notice of the reasons for any rejection of its books sent to persons incarcerated in the Jail and an opportunity to be heard before such rejections take place.

## II.  STATEMENT OF FACTS

HRDC is a not-for-profit charitable organization recognized under § 501(c)(3) of the Internal Revenue Code, incorporated in the State of Washington and with principal offices in Lake Worth, Florida.  For more than 27 years, HRDC has focused its mission on public education, advocacy, and outreach on behalf of, and for the purpose of assisting, prisoners who seek legal redress for infringements of their constitutionally guaranteed and other basic human rights.  HRDC accomplishes this mission through litigation, advocacy, and publication and/or distribution of books, magazines, and other information concerning prisons and prisoner rights.  Declaration of Paul Wright in Support of Plaintiff's Motion for Preliminary Injunction ("Wright Decl."), ¶ 2,

attached as Exhibit A.

HRDC distributes approximately fifty different softcover books on subjects of interest to prisoners and others who are interested in the criminal justice system.  HRDC is the publisher and/or distributor for these books.  *Id.* ¶ 5.  The books are designed to foster a better understanding of criminal justice policies and to allow prisoners to educate themselves about the law and issues related to their imprisonment and/or their pending cases, such as legal research, prisoners' rights, health care issues, and similar topics.  *Id.*

Defendants have adopted a policy and practice that prohibits prisoners held at the Jail to receive books from HRDC.  Since October 2017, HRDC has mailed the following books to different prisoners at the Jail: 1) *The Habeas Citebook: Ineffective Assistance of Counsel* ("*Habeas Citebook*"), which describes the procedural and substantive complexities of federal habeas corpus litigation with the goal of identifying and litigating claims involving ineffective assistance of counsel, 2) *Protecting Your Health and Safety* ("*PYHS*"), which describes the rights, protections and legal remedies available to prisoners concerning their incarceration, and 3) *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* ("*Prisoners' Handbook*"), which provides prisoners information on enrolling at accredited higher educational, vocational and training schools.  *Id.* ¶ 11.  Each of these books were individually addressed and mailed to prisoners in the Jail.  *Id.*

Defendants censored these books and did not deliver them to the intended prisoner-recipients.  Eighty-five (85) of the books were returned to HRDC in their original packaging with writing on the outside stating either "Against Policy Unauthorized Material" or "Return to Sender Refused".  *Id.* ¶ 12.  Additionally, Defendants' censorship of HRDC's books was done without

adequate notice and an opportunity to appeal the censorship decisions in violation of the due process clause of the Fourteenth Amendment. *Id.* ¶ 13.

By adopting and applying such policies, and by doing so without due process, the Jail is irrationally interfering with protected expressive activities and chilling future speech. Since HRDC will continue to mail copies of its books and other publications to subscribers, customers and other individuals imprisoned at the Jail, *id.* ¶ 14, Defendants' policies and practices will violate HRDC's free speech rights in the future without due process, causing irreparable harm.

### III. LEGAL STANDARD FOR GRANTING PRELIMINARY INJUNCTION

Under Rule 65 of the Federal Rules of Civil Procedure, a court may issue a preliminary injunction on notice to the adverse party. Fed. R. Civ. P. 65. "In determining whether to grant a preliminary injunction, a court must weigh (1) the likelihood that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the relative weight of the harm alleged by the movant and the harm to the nonmoving party; and (4) the public interest." *Citizens United v. Gessler*, 773 F.3d 200, 209 (10th Cir. 2014); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013).

### IV. ARGUMENT

HRDC respectfully moves this Court to enter a preliminary injunction prohibiting Defendants from continuing to violate Plaintiff's constitutional rights to free speech and due process. The Court should grant HRDC's motion because (1) HRDC is likely to succeed on the merits of its claims; (2) HRDC is currently suffering and will continue to suffer irreparable harm in the absence of preliminary relief, (3) a comparison of the relative harms to the parties weighs in HRDC's favor, and (4) an injunction is in the public interest.

A.    **HRDC is Likely to Succeed on the Merits of Its Claims**

1.  *First Amendment Claim*

A publisher's right to send publications and other correspondence to prisoners is clearly established.   "[T]here is no question that publishers who wish to communicate with those who…willingly seek their point of view have a legitimate First Amendment interest in access to prisoners."  *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *see also Prison Legal News v. Livingston,* 683 F.3d 201 (5th Cir. 2012); *Hrdlicka v. Reniff*, 631 F.3d 1044 (9th Cir. 2011) ("publishers and inmates have a First Amendment interest in communicating with each other."); *Jacklovich*, 392 F.3d 420, 431 (10th Cir. 2004) (finding a First Amendment right for incarcerated persons to receive information from Prison Legal News while in prison).  "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), nor do they bar others "from exercising their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh*, 490 U.S. at 407.

Indeed, the interests of senders and their intended recipients are "inextricably meshed," and any "censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners."  *Procunier v. Martinez*, 416 U.S. 396, 409 (1974), *overruled in part on other grounds by Thornburgh*, 490 U.S. 401 (1989).  "Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Id.* at 408.

Further, HRDC's speech covers topics of great public concern and therefore "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); *see also Pell v. Procunier*, 417 U.S. 817, 830 n.7 (1974) ("[T]he conditions in this Nation's prisons are a matter

that is both newsworthy and of great public importance.").

Accordingly, to withstand First Amendment scrutiny, a prison policy must be "reasonably related to legitimate penological interests" under the four *Turner* factors:

> (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Turner*, 482 U.S. 78 at 89. While this case involves the free speech rights of free persons, and not of prisoners, for purposes of this motion HRDC assumes that the Court will employ the *Turner* test as a means of ensuring that any injunctive relief incorporates due deference for the exigencies of jail operation. As evidenced below, HRDC is highly likely to prevail on each of the *Turner* factors with regard to the censorship experienced by HRDC.

### (a) Defendants' Mail Policy is Not Rationally Related to any Legitimate Penological Objectives.

The first factor a court considers in determining the validity of a prison regulation is whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 482 U.S. at 89. This factor is "sine qua non. Therefore, if the prison fails to show that the regulation is rationally related to a legitimate penological objective, [the Court] do[es] not consider the other factors." *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003) (citation omitted); *see also Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) (concluding that mail restriction was not rationally related to a legitimate penological objective and declining to consider the other *Turner* factors).

Under this prong, "the 'logical connection between the regulation and the asserted goal' must not be 'so remote as to render the policy arbitrary or irrational,' and the governmental

objective must be both 'legitimate and neutral.'" *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (*quoting Turner*, 482 U.S. at 89-90). That is, "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006). When a plaintiff presents evidence to refute a "common-sense connection" between a legitimate objective and a prison policy, the defendant "must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational." *Frost*, 197 F.3d at 357.

> Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then *demonstrate* both that these specific interests are *the actual bases* for their policies and that the policies are reasonably related to the furtherance of the identified interests. An *evidentiary showing* is required as to each point.

*Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir. 1990) (emphasis added). The government may not pile "conjecture upon conjecture" to justify infringement of constitutional rights. *Reed v. Faulkner*, 842 F.2d 960, 963-964 (7th Cir. 1998). Or, as the Sixth Circuit put it, prison officials do not set constitutional standards by fiat. *Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989).

In this case, Defendants policy of censoring books fails to advance any legitimate penological objective, rendering it irrational and arbitrary. In fact, the Jail's censorship of HRDC's books hampers the important penological objective of rehabilitating those imprisoned for committing a crime. The United States Supreme Court has recognized that "[s]ince most offenders will eventually return to society, a paramount objective of the corrections system is the rehabilitation of those committed to its custody." *McKune v. Lile*, 536 U.S. 24, 36 (2002) (citation omitted). Further, the "weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation…." *Martinez*, 416 U.S. at 412-13 (1974); *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63 (1973) ("good

books … lift the spirit, improve the mind, enrich the human personality, and develop character").
As such, it is difficult to see how depriving a prisoner of knowledge about the outside world could
help prepare the prisoner for his or her eventual return to that world:

> [c]onstructive, wholesome contact with the community is a valuable therapeutic
> tool in the overall correctional process.…Correspondence with members of an
> inmate's family, close friends, associates and organizations is beneficial to the
> morale of all confined persons and may form the basis for good adjustment in the
> institution and the community.

*Id.* at 412 n. 13 (quoting then Policy Statement 7300.1A of the Federal Bureau of Prisons and
Policy Guidelines for the Association of State Correctional Administrators).

Other authorities echo the importance of receiving and reading mail in the corrections
context.  A publication of the Urban Institute's Justice Policy Center, *From the Classroom to the
Community: Exploring the Role of Education during Incarceration and Reentry* (2009), noted the
link between public safety and access to pro-social activities such as reading:

> [r]esearch demonstrates that education can change thinking, encourage pro-social
> behavior, increase employment, and reduce recidivism. Education's power to
> transform lives in both tangible and intangible ways makes it one of the most
> valuable and effective tools we may have for helping people rebuild their lives after
> incarceration, as well as for combating crime and reducing criminal justice costs.

*From the Classroom to the Community*, p. 2.  The American Bar Association has also underscored
the importance of mail to prisoners noting that "[m]ail is a crucial method by which prisoners
maintain and build familial and community ties."  *ABA Standards for Criminal Justice: Treatment
of Prisoners*, 3d ed. (2011), at 264-66.  Even the national detention standards for U.S. Immigration
and Customs Enforcement facilities recognize the importance of detainees' ability to communicate
with those on the outside, requiring that "Detainees shall be able to correspond with their families,
the community, legal representatives, government offices and consular officials."  ICE Policy 5.1.

Accordingly, the Jail's censorship of HRDC's books is not only irrational, it is harmful to
society's interest in rehabilitating prisoners.  HRDC's books, as described *supra*, furnish prisoners

with not only an understanding of their rights while incarcerated, but also aim to provide them with a foundation upon which they can rebuild their lives outside of prison walls. It is counterproductive for the Jail to deny prisoners information on conditions of confinement and legal rights, or on how to address their educational needs. The censorship retards, rather than promotes, the penological goal of rehabilitation.

Because the Defendants' policy and practice of rejecting HRDC's books is not rationally related to any legitimate penological objectives, and in fact, hamper the crucial penological goal of rehabilitating prisoners, the first *Turner* factor weighs in HRDC's favor.

**(b) There are No Alternative Avenues for HRDC to Exercise Its First Amendment Right to Communicate with Prisoners in the Jail.**

The second *Turner* factor concerns whether there exist alternative means to exercising the constitutional right in question. The Supreme Court has made it clear that the absence of such alternative means may be seen as evidence that the prison regulations in question are unreasonable. *Banks*, 548 U.S. at 532 (*citing Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (holding that "no alternative means of communication" is "some evidence" that the prison regulations at bar were "unreasonable.")).

Here, the Jail's censorship of HRDC's books is not ameliorated by any alternative means of exercising its constitutional rights. HRDC cannot effectively or reasonably be expected to communicate its written speech by telephone or in-person. Nor should access to television, radio, or some other form of communication be seen as an adequate alternative to reading HRDC's books. Rather, as the Supreme Court noted in *Pell v. Procunier*, courts should apply the principle that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Procunier*, 417 U.S. 817, 822 (1974); *see also Banks*, 548 U.S. at 543 ("the State may not, consistently with the

spirit of the First Amendment, contract the spectrum of available knowledge."); *Mann v. Smith*, 796 F.2d 79, 83 (5th Cir. 1986) (noting that "whatever the intrinsic merits of television in comparison with newspapers and magazines, the contents of television are different from what one finds in the printed media," and holding that Plaintiff's constitutional rights were violated where the Midland County Sheriff denied him access to newspapers and magazines but allowed access to television).

In short, it is not for Defendants to decide whether television, radio, or some other form of communication can adequately serve the First Amendment right to receive protected materials. Rather, Defendants should allow books into the Jail and evaluate the publication individually to determine whether it poses a threat to a legitimate penological objective.  The restriction of such communication only serves as a barrier to the free speech rights of publishers without any regard to the legitimacy of the communication and its import to prisoners.

### (c) Accommodating HRDC's First Amendment Rights Would Impose No Significant Burden on Jail Officials, Other Inmates, or Allocation of Resources

The third *Turner* factor is the effect an accommodation of the constitutional right in question will have on inmates, prison staff, and on resource allocation.  *Turner*, 482 U.S. at 90.  In this context, the Supreme Court has said that "the policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction."  *Martinez*, 416 U.S. at 414 n. 14 (1974).  In other words, the fact that other institutions are effectively able to accommodate the constitutional right in question indicates that a particular restriction is not necessary.  Further, "the First Amendment does not permit the State to sacrifice speech for efficiency."  *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 747 (2011) (citation omitted).

Since its founding in 1990 as *Prisoners' Legal News*, HRDC has sent its materials to thousands of prisoners nationwide.  Wright Decl. ¶ 6.  HRDC distributes its books to correctional facilities across the United States, including the Federal Bureau of Prisons, which houses over 200,000 inmates without censorship.  *Id.* ¶ 7.  Notably, HRDC is not aware of any state or federal correctional facility where HRDC's books have created a security problem.  *Id.* ¶ 8.  This is strong evidence that the third *Turner* factor favors HRDC, and an arbitrary barrier to this communication irrationally interferes with core protected speech.

### (d) Defendant's Mail Policy is an Exaggerated Response to Perceived Security Concerns

The final *Turner* factor is whether the regulation in question is an exaggerated response to prison concerns.  *Turner*, 482 U.S. at 90.  Here, "the existence of obvious, easy alternatives" may be seen "as evidence that the regulation is not reasonable."  *Id.*  As the Supreme Court has recognized, if a "claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  *Id.* at 91; *see also Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068, 1086 (D. Or. 2013).  Importantly, when a court finds that a restriction on a prisoner's First Amendment rights is an "exaggerated response" to any legitimate concerns, the restriction cannot stand.  *Id.* at 91.

Defendants' censorship policy also fails under this factor, because there is an obvious, easy alternative to rejecting all books mailed to the Jail.  Despite Defendants' claimed justifications, the fact that more than 2,600 correctional facilities nationwide, including maximum-security facilities, accept HRDC's materials suggests that the Jail's ban is an exaggerated response.  *See Hrdlicka*, 631 F.3d at 1055 (holding that widespread distribution of publisher's materials suggests jail bans may be exaggerated response).  The Jail can and should effectuate a mail processing system

11

consistent with the industry norm where publications are reviewed individually to determine whether they pose a risk to a penological objective.

The above analysis demonstrates that each of the *Turner* factors weigh in Plaintiff's favor. Therefore, Defendants' mail policy is an illegal intrusion on HRDC's First Amendment rights, and Plaintiff is likely to succeed on this claim.

### 2. *Due Process Claim*

The Supreme Court has long recognized that a publisher's First Amendment right to communicate with prisoners is a liberty interest that must be afforded due process protections under the Fourteenth Amendment. *Procunier*, 417 U.S. at 832. As the Court put it in *Martinez*:

> [T]he decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment. As such, it is protected from arbitrary governmental invasion.

*Martinez*, 416 U.S. at 417-18.[1]

The Due Process Clause requires a correctional institution, each time it censors an incoming publication, to provide both the prisoner and the sender with notice and an opportunity to challenge the censorship. A prisoner must receive: "(1) appropriate notice; (2) a reasonable opportunity to challenge the initial determination; and (3) an ultimate decision by a disinterested party not privy to the initial censorship determination." *Hopkins v. Collins*, 548 F.2d 503, 504 (4th Cir. 1977). Prisons must also provide senders of publications with procedural protections, since giving notice and an opportunity to be heard to the prisoner alone will not suffice. *Montcalm Publ.*

---

[1] Because the Supreme Court already determined in *Martinez* the minimum procedural requirements that must be provided when mail addressed to prisoners is rejected, the multi-factor reasonableness test set forth in *Turner* does not apply to due process claims. *See Krug v. Lutz*, 329 F.3d 692, 698 n.5 (9th Cir. 2003).

*Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996). "An inmate who cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication." *Id*. The *Montcalm* Court noted that "providing a copy of [a rejection notice] to publishers of disapproved publications and allowing the publishers to respond in writing would pose a minimal burden on corrections officials." *Id*. "Without notifying the free citizen of the impending rejection, he would not be able to challenge the decision which may infringe his right to free speech." *Martin v. Kelley,* 803 F.2d 236, 244 (6th Cir. 1986); *see also Jacklovich*, 392 F.3d at 433; *Cafone v. Manson*, 409 F.Supp. 1033, 1042 (D. Conn. 1976).

An opportunity to be heard is a crucial, constitutionally-mandated chance to correct errors and challenge censorship decisions. Providing notice and an opportunity to be heard is important because it allows publishers to investigate and to appeal violations of their First Amendment rights, as well as to assist subscribers in filing challenges to such violations within the correctional grievance system. *See Montcalm Publ. Corp.*, at 108–09. If correctional facilities are allowed to simply throw away items that they choose not to deliver without any notice, it is impossible for publishers and prisoners to know what materials are not being delivered and whether their rights are being violated. *Id.* at 109.

Correctional facilities in other jurisdictions provide due process to publishers and prisoners when refusing to deliver publications. For instance, the Federal Bureau of Prisons has an explicit policy requiring it to notify prisoners and publishers, identifying the specific articles or materials rejected and allowing independent review of a warden's rejection decision. *See Thornburgh, supra*, 490 U.S. at 406. This policy was upheld by the U.S. Supreme Court and acts as a model for other correctional facilities. *Id*.

Although Defendants are constitutionally mandated to afford due process protections to

publishers when censoring prisoner mail, they have plainly failed to do so in this case.  For all of the censored books at issue here, HRDC received inadequate notice when its publications were censored, was not provided any reason for the censorship, and had no opportunity to challenge the rejection of its mail by the Jail.  Wright Decl., ¶ 13.  Thus, Defendants have violated HRDC's due process rights under the Fourteenth Amendment.

**B.**  **HRDC Is Suffering Irreparable Harm Due to Defendants' Constitutional Violations**

It is well established that "'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Citizens United*, 773 F.3d at 218; *see also Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").  The violation of a First Amendment right is presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983) (citation omitted).  "Monetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011); *see also Independence Inst. v. Gessler*, 936 F.Supp.2d 1256, 1281 (D. Colo. 2013) ("damages cannot replace the loss of protected First Amendment rights").  Further, "when a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (upon showing a likelihood of success on the merits in the First Amendment context, the other factors are satisfied; irreparable injury is deprivation of First Amendment rights; injury outweighs defendant's inability to enforce

unconstitutional statute; public interest in free expression is protected).

Accordingly, courts have repeatedly found irreparable harm based on the denial of First Amendment rights in correctional settings.  *See, e.g., Jacklovich,* 392 F.3d at 428; *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of preliminary injunction against prison publication policy) (*quoting Elrod*, 427 U.S. at 373); *Prison Legal News v. Lehman*, 397 F.3d 692, 699-700 (9th Cir. 2005) (affirming grant of permanent injunction of ban on non-subscription bulk mail and catalogs requested by prisoner); *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) (concluding that mail restriction was not rationally related to a legitimate penological objective and declining to consider the other *Turner* factors); *Mann*, 796 F.2d at 82 (county jail's policy of banning newspapers and magazines violated pretrial detainee's First Amendment rights); *Kincaid v. Rusk,* 670 F.2d 737, 744 (7th Cir. 1982).

The irreparable harm suffered by HRDC is concrete, severe, and ongoing.  Defendants have censored and will continue to censor HRDC's books sent to prisoners without due process, thwarting HRDC's core protected speech on government policies, prisoner rights, jail conditions, and the criminal justice system.  Presumably, other publishers have been or will be censored in the same way.  Accordingly, HRDC will clearly continue to suffer irreparable harm if a preliminary injunction does not issue.

### C.     A Preliminary Injunction Would not Cause Substantial Harm to Others.

Any potential injuries to the Defendants are minimal and speculative.  No great cost or expenditure of time is required to change the current policies to allow HRDC to deliver its books to prisoners and afford constitutionally mandated due process; indeed, this is the very process that is used at the Federal Bureau of Prisons and by numerous jails and prisons across the country. Their experience demonstrates that there would be no substantial harm to the Defendants if they

were enjoined from enforcing the mail policy now in effect.

In contrast, as noted *supra*, the irreparable harm suffered by HRDC is concrete, severe, and ongoing.  Accordingly, this factor weighs in HRDC's favor, given the irreparable harm suffered by HRDC if a preliminary injunction does not issue, and the minimal effort necessary to vindicate its rights under the First and Fourteenth Amendments.

### D.  A Preliminary Injunction Serves the Public Interest

As the Tenth Circuit has held, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012).  This principle includes injunctions protecting First Amendment freedoms.  *See e.g.*, *Cate,* 707 F.2d at 1190 (noting "[t]he strong public interest in protecting First Amendment values").  As set forth above, there are substantial constitutional violations at issue here, and as such, the public interest is best served by the issuance of a preliminary injunction.

As discussed above, it is also in the public interest to allow prisoners access to reading materials while incarcerated.  Reading materials enable detainees to engage in productive activity rather than sitting idle, thus helping to avoid conflicts and incidents of violence in the jail.  Wright Decl. ¶ 9.  In addition, reading allows detainees to keep their minds sharp, helping them to be productive citizens when released back into society.  This speaks to the hunger for expressive freedom that Justice Thurgood Marshall described in *Martinez*, 416 U.S. at 428 (Marshall, J., concurring) ("When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions….  It is the role of the First Amendment and this Court to protect those precious personal rights by which we satisfy such basic yearnings of the human spirit.").

### E.    The Bond Requirement Should Be Waived

Under Federal Rule of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set no bond or only a nominal bond. *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (citation omitted); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.") (*quoting Cal. ex. rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)); *Ctr. For Food Safety v. Vilsack*, 753 F. Supp. 2d 1051, 1061–62 (N.D. Cal. 2010) (waiving bond requirement for small non-profit organization suing government entity because bond would effectively deny access to judicial review), *vacated and remanded on other grounds by Ctr. For Food Safety v. Vilsack*, 636 F.3d 1166 (9th Cir. 2011).

Waiving the bond requirement is appropriate here because HRDC is a small non-profit organization of nineteen employees that would be unable to post anything more than a nominal bond. Wright Decl. ¶ 24. A bond requirement would effectively deny access to judicial review for HRDC, which is especially harmful because HRDC is alleging violations of its fundamental rights under the Constitution. *See Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.").

## V.   CONCLUSION

As set forth above, HRDC has meritorious claims on which it is likely to succeed on the merits. HRDC is suffering and will continue to suffer irreparable harm to its First and Fourteenth Amendment rights that far outweigh any possible harm to the Defendants from the issuance of an

17

injunction.  HRDC lacks any adequate remedy at law to address the ongoing violations of its constitutional rights.  Finally, the public interest favors the protection of constitutional rights.  For these reasons, HRDC respectfully requests that this Court grant its motion for preliminary injunctive relief.

Respectfully Submitted,

/s/ *Laura Schauer Ives*
Laura Schauer Ives, NM Bar No.: 12463
KENNEDY KENNEDY & IVES
1000 2nd Street NW
Albuquerque, NM  87102
lsi@civilrightslaw.com
Telephone: (505) 244-1400 / Fax (505) 244-1406

/s/ Bruce E.H. Johnson
Bruce E.H. Johnson, Wa. Bar No. 7667
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 220
Seattle, WA  98101
Telephone: (206) 757-8069 / Fax (206) 757-7069
brucejohnson@dwt.com

/s/ Sabarish Neelakanta
Sabarish Neelakanta, Fla. Bar No.: 26623
sneelakanta@hrdc-law.org
Masimba Mutamba, Fla. Bar No.: 102772
mmutamba@hrdc-law.org
Daniel Marshall, Fla. Bar No.: 617210
dmarshall@hrdc-law.org
Human Rights Defense Center
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523 / Fax (866) 735-7136

*Attorneys for Plaintiff*